Ewing, C. J.
At the outset of our examination of this case, it is important to open the pleadings and ascertain with precision the issues which have been formed, in order not only to present distinctly the questions to be solved, but because, as it will be seen, we shall thereby simplify our duty, and relieve ourselves and the cause from the investigation of several of the topics discussed at length and with much ability upon-the argument at the bar.
The defendants being called on by the information to shew by what warrant and authority they daim to have and use the office of trustees of the Presbyterian church in the city of Perth Amboy, into which it is alleged they have unlawfully intruded, say, that one of them, William M. Crowell, was duly elected a trustee at an election held on the eleventh day of February, 1823, agreeably to the provisions of the statute for the incorporation of religious societies; and that the others, Waite, Hadden, Ayres, See and David 'Crowell, were duly elected trustees at an election held *409] on the *fourth’ day of December, 1823, according to the provisions of the same statute, by a majority of such of the members of the said religious society as attended for that purpose.
By replication, on the part of. the state, it is alleged, that the persons who attended on the fourth day of December, 1823, and by whom the election of that date, was made, were not members of the said religious society or congregation ; wherefore the said Waite, Hadden, Ayres, See and David Crowell, were not duly elected trustees; and as to William M. Crowell, that subsequently to the eleventh of February, 1823, that is to say, on the twenty-second of March, 1824, another election was held, at whieh another person was chosen in his stead, who duly took upon himself the office, and from thence he was a trustee no longer.
*507 The defendants, by rejoinder, say that the election of the fourth of December, 1823, was made by persons being in fact members of the said religious society or congregation; and upon this point issue is joined. And that the election oí the twenty-second of March, 1824, was illegal, due notice not having been given, inasmuch as the notice was given and directed only to those members who were pewholders of the church, and there were other members who were not pewholders, and who were not therefore notified to attend.
To which it is answered on the part of the state, that the notice was not given and directed only to those members who were pewholders; and that there were not then and there other persons members of the said religious society who were not pewholders; and that all the members of the said religious society entitled to vote at the said election were pewholders. And upon this matter issue is also joined.
By this view of the pleadings, it is seen, they bring into question the elections in December, 1823, and in March, 1824. Hence it follows that the transactions subsequent to the latter period, which have doubtless tended so much to widen division and inflame animosity in this congregation, and have been so truly painful to tHe friends of religious peace and order, are not to become the subjects of our enquiry. Having taken place since those elections, they cannot affect the questions on which the parties have thought fit to rest their respective claims. The placing of a lock on the door by the defendants was in April, 1824. The resolution that the doors of the church should not be opened to the supplies appointed *by the Presbytery, was [*410 made in the same month. The refusal by one of the defendants, acting as president of the trustees, to open the doors of the church, whereby the minister appointed by the Presbytery to supply the pulpit on that day was excluded, was on Sunday the second day of May, 1824. The open violence of strife,'which caused a mournful silence for more than a year to prevail where the language of prayer and praise was *508 wont to be heard, did not break out until after the last of the elections which have been mentioned. On the twenty-seventh of July, 1824, the Presbytery resolved, that the Session, and those with them, had acted according to the constitution and rules of the Presbyterian church, and that the other party, comprising the defendants, had acted in opposition to the rules and constitution, and had virtually renounced the government of the-church. All these things however are out of the limits by which the pleadings have bounded our research. And it would be to no effect, therefore, to examine the soundness of the argument urged on the part of the state, that by these acts the defendants, and those united with them, “ did refuse to submit to the censures of the church regularly administered,” and had thereby ceased to be members of the congregation.
Another topic suggested by the counsel of the state must necessarily be passed without examination. It was urged that the defendants were ineligible as trustees, because they wrere not members of the congregation. But the issue is on the membership of the electors, not of the elected. The membership of the latter cannot therefore be a distinct subject of enquiry, nor brought into view, otherwise than as involved with that of the former.
On the part of the defendants’ counsel it was strongly insisted, upon the argument at the bar, that this corporation is dissolved, the number of families having, as they said is shewn by the evidence, been reduced below thirty, the number required by the statute to constitute a congregation entitled to the enjoyment of corporate privileges. But if such is the fact, if the corporation is dissolved, by what authority do these defendants exercise their corporate offices ? If the corporation is dissolved, have not their functions as trustees, ipso facto, ceased ? Do they not, in the language of the information, usurp, intrude into, and unlawfully hold and execute them? We need not, however, resolve these questions. The existence of the corporation cannot in this *509 cause be ^legally made the subject of enquiry. Both [*411 parties in their respective pleadings have expressly averred, that the corporation existed at and for a long time previous to the exhibition of the information. It is an established rule that a jury cannot find in point of fact against what the parties in pleading have agreed and admitted, although the contrary be the truth. Com. Dig. tit. Pleader, S. 17; Bac. Abr. tit. Pleas, &c.; Buller N. P. 298; 2 Mod. 5.
The questions presented by the issues formed in the pleadings, are, 1. Whether the persons who assembled, and by whom the election of trustees was made, on the fourth day of December, 1823, were at that time members of the society or congregation ? 2. Whether the notice of the election on the twenty-second of March, 1824, was given and directed only to those members who were pewholders ? and, 3. Whether at that time there were members who were not pewholders ?
Who then are the members of a Presbyterian society or congregation ? The act of the legislature for the incorporation of trustees of religious societies, does not answer the enquiry. It does not explain the term, nor describe the qualification of members. It enacts that the trustees shall be chosen by the members of the society or congregation. But who are the members has been wisely loft by the legislature to be determined by the rules of each religious denomination. We must therefore have recourse to the constitution of the Presbyterian Church in the United States, as published under the authority of the General Assembly. In the fifteenth chapter of the form of government, which provides for the election of pastors, it is declared that on a Lord’s clay preceding the election, immediately after public worship, “ all the members of that congregation ” shall be requested to meet at a named day to proceed to the election of a pastor; that on the day appointed the presiding minister shall announce to the people that he will proceed, if such be their desire, “ to *510 take the votes of the electors of that congregation for a pastor.” And that in this election “ no person shall be entitled to vote who refuses to submit to the censures of the church regularly administered, or who does not contribute his just proportion according to his own engagements or the rules of that congregation, to all its necessary expenses.” These clauses serve sufficiently to fix the qualifications of membership, although they may not have been formally designed for that end. The form of government contains *412] no other. And they *are considered by the Presbyterian denomination as establishing “ the criterion by which the right of membership is determined,” as appears by the affidavit read before us of an eminent minister, whose experience in the councils and judicatories of that church is well known. He is a member of a Presbyterian congregation who submits to the censures of the church regularly administered, and contributes his just proportion according to his own engagements or the rules of that congregation, to all its necessary .expenses. He who refuses to submit to the censures of the church regularly administered, as also he who does not contribute his just proportion according to his own engagements or the rules of the congregation, is not a member. With the first of these qualifications we have at present no concern, because there is nothing in the evidence, as has already been remarked, to shew, until subsequent to March, 1824, a refusal to submit to the censures of the church. By the'other qualification the fact of membership is to be tested. And here, to avoid misunderstanding, I observe, that I employ the term, members, strictly in the sense in which it is used in the act of the legislature, and in the pleadings before us, that is to say, persons entitled to .act and vote in the affairs of the congregation. There is another and popular signification of the term, some times perhaps attached to it in the form of'government and in the proceedings of the church judicatories, but which is more extensive than the purview of the statute. Thus the *511 wife of a member, an infant of tender years who has been baptised, a communicant who from straitened circumstances, or other satisfactory reason, makes no pecuniary contribution to congregational expenses, all these are nevertheless called, and in many respects rightly, members of the congregation, or perhaps more correctly speaking, members of the church. 'In the former, or strict, and not in the latter or popular sense, I here use and understand the term.
The persons by whom the election of December, 1823, was made do not appear with all desirable certainty and precision. Joseph B. Wood, in his affidavit, states that he was present. He names nine persons who voted and believes there were at least six more, but cannot name them. Henry Hampton, in his affidavit, names the members of the congregation, twenty-three in number, who belonged to what was called the party of the defendants. All these he states were not present at the election. But it very sufficiently appears, and indeed was fully agreed, on the argument, • *that the persons who made the election are com- [*413 prised within the enumeration of Hampton.
The mode of contributing to the necessary expenses of that congregation, as appears from the minutes of their proceedings, and from one or more of the affidavits, was by the renting of pews, and by voluntary subscriptions in aid of the pew rents, and to root such pews as might he vacant from time to time, and to procure subscriptions, committees were usually appointed at meetings of the congregation in the spring of each year. In the spring of 1822 a subscription paper was opened, whereby the subscribers promised “ to pay to, the trustees oí the first Presbyterian church in Perth Amboy, or order, the sums annexed to their respective names, for the purpose of maintaining the preaching of the gospel in the said church, from the first May, 1822, to the first May, 1823.” This subscription paper was signed by all the persons mentioned by Hampton as belonging to the party of the defendants, except Abraham Bloodgood and *512 Joseph B. Wood. In the- month of September, 1823, a list of persons owing, according to their engagements, balances up to the first day of May, 1823, was under the direction of the trustees made out, and before the 17th of November, 1823, they were, except David Waite, severally called on by the collector, Charles Eord, who in his affidavit states, that some said they would pay until the time Dr. Andrews resigned and no longer; and that all, except such as are marked paid, on the paper, refused or neglected to pay. The list of those who thus refused or neglected to pay, includes all the persons mentioned by Hampton, except Daniel Ayres, Mary F. Lewis, William Bloodgood, Mordecai Noe, Abraham Bloodgood and Joseph B. Wood. Nor does the list shew that either of them paid. In the month of August, 1827, the trustees caused a list to be made of the persons who had not subscribed for the current year, but had held pews, and an account of their pew rents for the quarter ending the first of that month, during which period the public services of the church had been regularly performed by supplies under appointments of the Presbytery. This list bore all the names mentioned by Hampton, except Philip Bobinson, “Joseph Pigeon, Mary F. Lewis, Mordecai Noe, Alexander Bobinson, Abraham Bloodgood and Joseph B. Wood. The persons named in the list were called on by the collector, except Caleb Ward, and all refused to pay but Elizabeth Coddington,^ Clarkson Dunham and Linus Moore, *414] who said they would *but did hot. Daniel Ayres told the collector he would pay for no supplies; if they would get a settled minister he would hire a pew; and William Bloodgood said he had given up his pew on the first of May preceding. Mary F. Lewis had moved away from the congregation some months prior to the election, and had paid up to the time of her removal, as appears from the affidavit of Daniel Latourette. David Waite is not mentioned by Hampton, nor by Joseph B. Wood, and of consequence there is no evidence that he was present at the election; *513 and Abraham Bloodgood and Joseph B. Wood, named by Hampton, do not from any document before us, appear to have ever been in any wise contributors. Latourette, in his affidavit, also enters into a detail of the persons who had not fulfilled the stipulation contained in the subscription paper of the spring of 1822, and expresses his belief that Mordecai Noe was one of the number.
From a careful examination, then, of the evidence before us, it clearly results, that the persons named by Hampton, including all those by whom the election of December, 1823, was made, did not, at the time, contribute according to their own engagements to the expenses of the congregation. Oil the contrary, all of them had willfully and designedly omitted, and most of them had peremptorily refused to do so.
The reasons assigned for the omission to fulfil these engagements, some of which were urged on the argument by the counsel of the defendants, are wholly insufficient to dispense with them, or prevent the results which may legally flow from such omission. The answer repeatedly given to the collector was, “ I will not pay: call a parish meeting.” And the argument is, that as according to the practice of that congregation, the subscription was made under a vote of the people at a meeting annually held, neither the trustees nor any other persons were authorized, to ask or procure such subscription, except under a vote of a meeting, and a refusal to sign a subscription called for without such vote was not therefore a refusal to contribute “ according to the rules of that congregation.” Now it will readily be perceived that this argument, however valid against the calls for subscriptions subsequently made, without a congregational Meeting, can avail nothing in respect to the subscription of the spring of 1822, which was made in the ancient mode, after a vote, at the accustomed meeting; and which, therefore, beyond doubt, was not only according to the rules of the congregation, *but according to the actual and voluntary [*415 engagement of those by whom it was signed. Some of the *514 subscribers-assented to pay, and some actually did pay, up to the twentieth of December 1822, the date of the dissolu- ■ tion of their connection with the Bev. Mr. Andrews, but refused to pay any more or for any longer period. The engagement however which they had made, as appears by reference to the subscription paper, was to pay not merely for the support of a particular clergyman, “but for the purpose of maintaining the preaching of the gospel in the said church from the first of May 1822 to the first of May 1823 and the public sevices of the church were actually performed by supplies furnished in the usual manner by the Presbytery, to whom of consequence remuneration was due. Moreover, Daniel Latourette in his affidavit states, that at the resignation of Mr. Andrews there was a balance due to him, to pay which required all the subscription money. The same remarks may properly apply to the pew rent which has been mentioned and had been demanded of the pewholders, for having actually occupied the seats and enjoyed the services of the church, they were bound to pay . for their pews and according to the former terms, if no new contract was made.
By one of tl^e exhibits read before us it appears that a subscription paper dated twenty-first November 1823, was signed generally by the section of the congregation acting with the defendants, whereby they engaged to pay, one-half at three months and the other half at six months, sundry small sums, and some of them so very small as to be merely nominal, for the support of the gospel in the church. But this paper cannot justly have any legal operation to shew that the subscribers did contribute to the necessary expenses of the congregation nor to remove the effect of their antecedent omission and refusal. It was every way a nugatory act, done without the authority ®r consent, and against the will of the trustees for the' time being, and had not even the preliminary sanction of a congregational meeting, if such sanction were requisite.
Upon the argument at the bar it was contended by the counsel of the defendants that the electors of December 1823, *515 had unquestionably been at an antecedent period, for instance May 1822, members of the congregation, and that they must necessarily remain so unless disfranchised by some corporate or judicial act. This position is not, in its full extent, sound. There is an obvious *distinction between an expulsion [4-16 from membership and a voluntary relinquishment. The former may require a trial and decree either civil or ecclesiastical. The latter may be effected without either, for a person may voluntary renounce his membership, subject nevertheless to the fulfilment of existing obligations; and he does renounce it when he willfully and disignedly omits, or expressly refuses to contribute according to his engagements. Without ceasing to be a member in the popular acceptation, his right to act and vote may be suspended, or for the time, cease. Thus a citizen residing in one of our counties in the full enjoyment of all the rights of citizenship, may by removal into another county deprive himself of some of the most important, for instance, the right of suffrage, and he must even qualify himself, for example, by a residence of a year, in order to exercise that right in the other county. An individual may lor years have voted for members of council and assembly, yet when he ceases to be worth fifty pounds, or to be able to shew what the law has constituted the evidence of that fact, he is no longer entitled to vote. Let me put another case, by way of illustration. Suppose the qualifications required by the constitution of the Presbyterian church had been that every householder, submitting to the censures and contributing to the expenses of the church, should be a member and entitled to vote, and an individual, after having with these requisites for years acted and voted as a member, had ceased to be an householder. It is presumed no one will deny that at an election subsequently held he could not be admitted to vote, although no decree of disfranchisement or sentence of any occlestiastical or civil tribunal had passed against him. The proper questions to have been proposed to those who presented *516 themselves to vote at the election of December 1823 were not, Have you once been accepted as a member ? Have you since been deprived of .your privileges as such by some corporate or judicial act? but, Do you possess the requisite qualifications? Do you contribute according to your own engagements, or the rules of the congregation, to its necessary expenses? If the view I have, taken be correct, truth would have compelled all of them to answer in the negative.
Upon the whole I am of opinion that the persons who assembled, and by who the election was made, in December 1823, did not, at the time, possess the qualifications of membership, that they were not, at the time, members of that 417] congregation entitled to vote in *the election of trustees; and that on this first issue judgment should be rendered for the state.
The second question, whether the notice of the election on the twenty-second of March, 1824, was given and directed only to those members who were pewholders, may be readily answered. The original notice in writing is before us. The language of it resolves the question in the affirmative. “Notice. A meeting of the Presbyterian society or congregation in Perth Amboy, being pewholders in the church, will take place,” &c.
The' remaining question is, whether at the time of the last election there were any members of the congregation who were not pewholders. The meaning and application of the term members, which I have sought to attain in. the consideration of the first question, leave but a narrow field for the present enquiry. We have seen that they who did not contribute according to their engagements were not members. The number of those who had ever been contributors without being pewholders was very small. Among the persons enumerated by Henry Hampton were but two, Joseph Pigeon and Alexander Robinson. Of these, as appears by the affidavit of Daniel Latourette, Joseph Pigeon moved away and never paid anything, and Alexander Robinson *517 “ refused absolutely to pay, and wrote Latourette an abusive letter on the subject.” The persons who had been pew-holders and thereby contributors, either remained pewholders at the time of the March election, or had ceased to be so. If pewholders, they were embraced in the notice. If they had ceased to bo pewholders, they had ceased to be contributors, and therefore ceased to be members. And it hence clearly results that there were not at that time any members of the congregation who were not pewholders. As there were no members not pewholders, the notice given and directed to pewholders only was in effect a notice to all persons legally entitled to participate in the election. Upon the second issue then judgment should be rendered for the state.
Ford, J.
The State of New Jersey enquires by what authority the defendants claim to be trustees of the Presbyterian church at Perth Amboy. The pleadings of the parties admit the legal existence of a corporate body, and the right of this religious society to elect trustees; and there is no dispute on these two points.
Then the defendants plead a title to be trustees by virtue . of an election the fourth of December, 1823; and they aver that the *persons who voted at that election were [*418 members of the congregation; the state denies that the persons who voted at that election were members of the congregation. And this forms the first issue in the cause.
Next, William M. Crowell, (who had been chosen trustee at an election prior to December, 1823) insists that no subsequent election has removed him from office. The state avers that there was a subsequent election the twenty-second March, 1824, at which the said William M. Crowell was duly removed from office ; and the relators, James Harriot, Daniel Latourette, John Patrick, Charles Ford, Oliver W. Ogden, Benjamin Maurice and Alexander Semple were chosen trustees. In avoidance of the last mentioned elec *518 tion, Mr. Crowell denies the legality of the notice for holding it, because it was addressed only to pewholders, whereas he says there were other members of the society, not pew-holders, to whom the said notice was not addressed. The state rejoins that every member entitled to vote the twenty-second of March, 1824, was a pewholder. And this forms the second issue.
Instead of sending these issues to the determination of a jury, they have been submitted to the court, by agreement of the parties, upon affidavits on each side, together with the law arising on the case.
Plence it appears that the claim of the defendants (except Mr. Crowell), rests on this : whether the persons who voted in December, 1823, were members. Mr. Crowell’s claim turns on this : whether the notice for March, 1824, was addressed to all the electors. We are to examine, first, whether the persons who voted in December, 1823, were members entitled to vote.
It would seem as if the act for incorporating trustees of religious societies ought to have defined what qualifications should constitute membership ; yet it studiously avoids doing so. Thus, the first section only says, that every religious society may elect trustees; the fourth section that the members of the society may choose successors ; and the tenth section requires them to be persons who support the gospel; it neither defines membership nor its qualifications. If the statute had specified the qualifications that should entitle to membership any person possessing those qualifications might have forced himself on the society by legal process ; and persons destitute of those qualifications coul,d not have been received legally into the communion of the church. Moreover, if the civil power prescribed rights of member-*419] ship at all, it would *naturally accommodate them to such doctrine, discipline and government as were most conformable to its own faith; which is the very groundwork of a religious establishment. It therefore wisely leaves each *519 society to regulate these matters according to its own ideas of truth and convenience. But in giving such ample powers to these societies, it compels no citizen to join them or submit to their jurisdiction; nor, having joined them, to continue with them longer than he chooses. He may renounce their jurisdiction and withdraw at any moment; and afterward re-unite with them again if they are willing to receive him; for no religious society is compellable to receive a member against its will, nor to retain one-after it becomes dissatisfied with his conduct or conversation.
To determine therefore who are members entitled to vote, recourse must be had to the government and laws of each society; for as no society can expect peace or order in its affairs, or for any length of time, to protract its existence without rules and regulations, the Presbyterian society, (like others) lias adopted a constitution, government and laws for itself. It has ordained four church judicatories, a Session of the congregation, a Presbytery, a Synod, and in the last resort, a judicatory called the General Assembly.
Among its regulations one is cited as governing the subject in hand, in the following words, to wit: “In this election (for a pastor,) no person shall be entitled to vote who refuses to submit to the censures of the church, regularly administered, or who does not contribute his just proportion according to his engagements, or the rules of that church, to all its necessary expenses.”
Now there is no dispute about what persons did or did not vote at the election of December, 1823. The congregation was divided into two well defined parties, one of which, without intermixture, voted by itself. Before that time, and down to about the month of May, 1823, both parties had indiscriminately possessed and exercised the right of suffrage; and it is no unfair inference that they all continued in possession of the same right until December following, unless the state can shew some disqualification occurring within that interval.
*520 To fix a disqualification, therefore, on the voters of December, 1823, the state shews, that prior to that time, while the Eev. Mr. Andrews was pastor of this church, the trustees circulated a subscription to raise money for parish *420]¿'purposes; to which paper the ^parishioners put down their names for sums proportionate to their circumstances, or so nearly proportionate as to have excited on that point no dispute. Afterward the Eev. Mr. Andrews resigned his pastoral charge; and money being indispensably necessary to satisfy a large arrearage of salary owing to him, which it was incumbent on the congregation to pay; and also to pay supplies for the pulpit; a person was deputed to request payment ijof the money so subscribed; whereupon every individual of those who afterward voted at the election of December, 1823, refused to pay his subscription, and each one assigned reasons which evinced the refusal to be a deliberate one, arising in no case from destitution of means. Some would not pay for supplies if they were procured by the Session; some would not pay for them if they came from Presbytery; others wpuld not pay without a parish meeting; and some would pay for nobody, if they could not have the Eev. Mr. Andrews. Thus a predetermined and resolute refusal became common to that part; while the other part of the members, without any objection, paid up their dues. Thus 'the congregation became divided into two uniform parties; one composed of those who were contributors, and the other of those who were refusers. Soon after this the refusers caused notice to be given that an election would be holden for choosing a new set of trustees on the said fourth of December, 1823. The persons who had paid their dues did not attend. The refusers held the election by themselves; and after removing every trustee then in office, (except Mr. Crowell,) they elected the present defendants in their places. Here the state grounds its objections to' these voters on the foregoing law of the society, that no' person shall be allowed to vote who refuses to pay his just *521 proportion towards the necessary expenses of the society; and from thence concludes that the election of the defendants is void. Whether the foregoing law and facts will maintain the issue on the part of the state, so that the defendants must be ousted of the office of trustees, will depend on the sufficiency of the answers given to this case, in point of law and reason ; which answers wo shall proceed to consider.
The first is, that the regulation of this religious society which says that no one who does not contribute according to his engagements shall vote for a pastor, is one that has no application to the present case. It is limited expressly, it is said, to the business of electing a pastor, and cannot possibly apply to a subject so unlike *it as choosing [*421 trustees; the one being a spiritual, and the other wholly a temporal trust. But surely it cannot be maintained that choosing & pastor is a spiritual transaction, when according to the forms of the church every call must contain a contract of support. The election and support of a pastor fall as accurately under the denomination of temporal acts, therefore, as the election of trustees. And in further proof of its being a temporal affair, the trustees, who are temporal officers, may, according to a standing rule of the church, subscribe the call of the pastor instead of the congregation.
And this regulation of the society appears to deserve a much more liberal construction than that which would limit its operation to the single instance put in the rule, of choosing a pastor. The election of a pastor calls into exercise a function of greater importance to each member than any other temporal act he can perform in that character. By it he not only selects a teacher and spiritual guide, but binds himself by contract for his support. It is just, therefore, to infer the right of voting in all cases, from its being secured to members in this great particular. That tho society intended it as a criterion of the right of voting in all temporalities, becomes still more manifest from their having *522 no regulation but this to govern in voting for trustees. It stands on this foundation, that voting for a pastor is the greatest case, and the greater always comprehends the ■less, according to the maxim omne majus eontinet minus. Members who deprive themselves therefore of the greater right, of voting for a pastor, deprive themselves of the less right, of voting for trustees. There is but one rule for both cases; that which is put in the rule is by way of example for other cases, and amounts evidently to this principle, that non-contributors shall in no case vote. The same might be inferred from the very nature of the office of trustees. They are agents to receive the money of contributors and pay it over quarterly or yearly to the pastor, in performance of the contract in the call. It is the money of contributors in the hands of trustees who are accountable for the disposition of it to the owners. They cannot be called the trustees of a person who contributes nothing, for they hold nothing of his in their hands; nor could Ke maintain an action or a bill against them to account. Why should one man vote for trustees to take care of another man’s money who is able to appoint trustees for himself? Or why should one man appoint trustees from year to year, to support the *422] gospel with his neighbor’s *money, without contributing to that support himself? If he enjoys the gospel without charge, he ought to allow those who carry the burden to adjust it on their shoulders for themselves. If such be not the meaning of the regulation in question, these religious societies will be left without any guard for their temporalities. People of another denomination, or of no denomination, might usurp the power of putting in their trustees, and get in characters on purpose to dissipate their property. ' The statute does not require trustees to be responsible freeholders, or to be worth a cent, much less that they should give security against wastefulness or breach of trust. The regulation, in every view that can be taken of its principle, excludes from a vote in choosing *523 trustees, all persons who refuse to contribute to the expenses of the society. A contrary rule might break up religious societies of every denomination in the state. The present case forms an illustration of the strongest kind. A set of trustees who contribute to the support themselves, and represent all tlioso who do the same, are turned out of the management of thoir own affairs, to make way for another set, who do not contribute a cent themselves, and are the representatives of none who do. Under such a state of things, it may bo expected that the contributors will stay their hands also; and then, all contributions ceasing, the support is gone, and the society broken up. If those who contribute nothing can elect trustees this year, they can, by the same rule, do so next year, and so on for twenty years to come. Thus a majority of non-contributors might impose the whole support on a minority who were contributors, and yet keep the management in their own hands. If therefore the society did not possess any regulation, or the semblance of one on the subject, and we were compelled to decide on general principles, still the analogies of law and the rules of equity, which are rules of equality, would force us into the same conclusion, that persons refusing to contribute cannot vote.
Secondly: the defendants charge an usurpation against the Session, for transcending the limits of their spiritual office, in originating a temporal subscription to raise money, without having the sanction of a parish meeting for the sum. Dr. M’Dowell and the Rev. Mr. Andrews concur in their opinions of this step, as being rather unusual and not according to custom. Suppose their opinions to be correct, still the subscription amounted only to an irregularity, palliated too by circumstances of emergency. Half the ^'congregation, or moro, had refused payment of their [*423 dues; and yet there was a debt to the Rev. Mr. Andrews to be provided for, beside supplies for a vacant congregation; and this new subscription was merely auxiliary to the pur *524 poses of the old one; it contained nothing hostile to the judicatories of the church, their regulation respecting supplies or modes of internal government. Suppose it irregular, it was not void; it was merely voidable, that is liable to correction or amendment by the congregation in that or any future cases. Subscribers to it would at least be contributors defacto, and retain the right of voting against such a mode of subscription in future cases. But the persons who voted in December, 1823, did not preserve to themselves the right of voting, by any act; neither by paying up their dues on the old subscription, nor by subscribing the new one; they chose to assume the condition, in every view, of non-contributors, and voluntarily disfranchised themselves as voters. But they are not obliged, even now, to remain in this condition a moment longer than they please; for whenever they pay up their dues and become contributor’s, the right of voting will revive.
Thirdly; the defendants present an alternative to the following effect: that if the electors of December, 1823, were members, then the election was valid, and the defendants cannot be ousted; but if they ceased to be members, the remaining number was less than thirty, and under the tenth section of the act, could not continue the corporation in existence. Admit the latter part of the alternative to be true, the former part is not so. Their membership might have continued, but they had parted with the right of voting. A congregation evidently consists of two kinds of members ; one possessing the right to' vote and the others not. This distinction appears to be made by the society itself, in their order or regulation touching the election of a pastor. It directs notice of a meeting for that purpose to be given to the members of the congregation, but when assembled the moderator shall proceed to take the votes of the electors of the congregation; thus plainly distinguishing members from electors. Moreover, persons under age cannot certainly be electors, yet they are as certainly members of the congrega *525 tion, and as such are received into the communion of the church. Poor communicants, also, who possess no ability of contributing to the support of the gospel, nor consequently any title to vote, are nevertheless members of the religious society. Nothing in the *book of church government [*424 countenances the idea that married women can vote, yet they are subject (separately from their husbands) to the discipline and censures of the church, and therefore must be regarded as members of the religious society. Therefore to constitute a valid election of trustees the voters must be members, and something more; they must be members and contributors. And this must be the sense of the issue.
Fourthly; the defendants claim for their constituents the character of contributors, from their having originated a subscription for the support of the gospel themselves, and put down their names to it. They connected with it, however, a set of resolutions militating against the government and laws of the Presbyterian society. They resolved that no supplies should be paid out of this fund, if those supplies were procured by the Session, or came by the appointment of Presbytery. Now the obligation of Presbytery to appoint supplies, and to exercise in this way a constant superintendence, is the very bond of union between them and vacant congregations. The subscription was a blow aimed therefore at a vital principle of the society. As one of the counsel properly observed, it flew in the face of the Session and Presbytery, and in fact, of all the judicatories of the church. As a Presbyterian measure, it was therefore utterly void. The subscribers to it might be contributors to an independent church, but not to the Presbyterian church. If Presbytery had countenanced that proceeding, they would have subverted their own government, and laid a foundation for endless confusion among their vacant congregations. This court must decide according to the laws of that society; and as they admit of none for electors who refuse payment according to their engagements, the election of December, *526 1823, cannot be supported, and judgment must of consequence go for the state, on the first issue, against all the defendants but Mr. Orowell. His claim demands our next attention.
Mr.' Orowell asserts that the election by which the contributors endeavored to remove him from office in March, 1824, was holden under an illegal notice, addressed to pew-holders only, and not to any other persons. He proves this allegation, touching the form of the notice, by the paper itself, which addresses the invitation evidently only to pew-holders. And the contributors designed it, most probably to be in that form, as they had passed a preceding resolution that none but pewholders should be entitled to vote. 425] *The notice is in such full conformity to that resolution as to preclude the idea of its being so drawn through any mistake. How I exceedingly doubt the propriety of any resolution that would limit the right of suffrage to pew-holders only. The society by its regulations extends the right to contributors, paying no regard to their owning seats in the church, or whose seats they sit in, or even so much as requiring their attendance at church, in order to be entitled to vote. The church indeed exhorts their attendance at public worship, and offers the most solemn and cogent reasons in favor of it, but it employs no coercion, and is very far from depriving men of temporal rights for the omission of spiritual duties. The resolution is introductory -therefore of a new qualification for voting in requiring every elector to be a pewholder, whereas the regulation of the society requires no more than that he be a member and contributor; and if the issue turned on the validity of this resolution, I should hold the resolution to be erroneous and void; because a member may contribute in many other ways beside the single one of paying rent' on a pew.
But the pleadings do not put the validity of this resolution in issue; they raise quite a different point. The statute requires a notice to all ike electors; and if there existed a *527 single elector who held no pew in the church, that person had no notice to attend; on the contrary it was an intimation that his attendance would be useless. The parties have taken their issue therefore on a very important fact, whether at that time there existed a member entitled to vote who was not a pewholder. If there were none such, then notice to pewholders was indeed notice to all tho electors. Now on this point there is offered to us no contrariety of evidence. It is proved on the part of the state that every member who paid up his dues took a pew in the church. On the other hand there is no evidence of a single contributor who did not do so. This vindicates the election of March 1824 against the only objection taken to it; and all the issues stand in favor of the state. Of course judgment must be rendered in its favor.
Drake, J. concurred with the opinions delivered.
Judgment for the state.
Note. — In the argument of tills case the attorney-general was associated with Mr. Hardcriberg, on the part of the state, and Mr. Wall argued with Mr. Wood on the part of the defendants. But the reporter, not having notes of those gentlemens' argument, lias nor inserted them. They maintained the same general topics as their colleagues.
*528 APPENDIX
[Tlie Reporter is indebted to tbe politeness of the late Chief Justice Kirkpatrick, for the following opinion delivered by him, in the ease of the Stale against Jabez Parldmrst, in the year 1802; and as it involves several important constitutional questions, he believes he will be rendering a service to the public by giving it insertion in this volume].